ARNOLD, Appellee,

v.

ARNOLD, Appellant.

[Cite as *Arnold v. Arnold* (1999), 135 Ohio App.3d 465.]

Court of Appeals of Ohio,
Twelfth District, Fayette County.

No. CA98–12–021.

Decided Nov. 1, 1999.

466

*David B. Bender,* for appellee.

*Hapner & Hapner* and *Jon C. Hapner,* for appellant.

---

VALEN, Judge.

Defendant-appellant, Kevin W. Arnold, appeals the decree of divorce issued by the Fayette County Court of Common Pleas naming plaintiff-appellee, Angela D. Arnold, the residential parent and legal custodian of the parties' only son, Quentin Tyler Arnold.

Kevin and Angela were married in March 1990, and Quentin was born on March 25, 1991. In August 1996, Angela filed a complaint for divorce. In her complaint, Angela requested that she be designated Quentin's residential parent and legal custodian.

Prior to the final hearing, Angela's counsel filed a motion *in limine* requesting that the trial court exclude any and all evidence that Kevin might seek to introduce regarding Angela's alleged extramarital affairs. Angela contended that such evidence was not relevant to the issue of custody. On March 13, 1997, the magistrate issued an order precluding Kevin from introducing evidence of extramarital relationships unless the evidence was substantially relevant to the best interest of Quentin.

On April 23, 1997, the magistrate held a final divorce hearing at which both parties presented witnesses. A number of friends of the family testified on Angela's behalf about recent changes in Quentin's behavior. In general, they testified that Quentin frequently expressed a desire to stay with Angela, rather than to go with Kevin. Kevin objected to the admission of all statements made by Quentin as inadmissible hearsay. The trial court overruled the objections, stating, "We don't allow children to testify in court so the court's made the child unavailable as a witness. Go ahead."

Angela testified that she was Quentin's primary caregiver. Additionally, she testified that in an effort to be more available for Quentin, she had recently switched from the second shift at her current job to the first shift, 7:30 a.m. to 4:00 p.m. Angela stated that Quentin's behavior had recently become hostile and withdrawn. She testified, over Kevin's hearsay objection, that Quentin was afraid to visit Kevin because Kevin had told Quentin that he might never see his mother again. On cross-examination, Angela admitted to suffering from bouts of depression in the past, but stated that she had sought medical treatment for her condition.

Kevin presented testimony from several witnesses who indicated that Kevin would be the better residential and custodial parent for Quentin. Kevin presented evidence that he spent as much time as possible with Quentin and was currently coaching Quentin's T-ball team. Throughout the hearing, Kevin attempted to introduce evidence of Angela's alleged extramarital affairs. Each time the magistrate re-advised Kevin that if the evidence did not directly affect the best interest of Quentin, it would be stricken. Near the conclusion of the hearing, the magistrate struck all such testimony from the record because there was no evidence that Angela's behavior had adversely affected Quentin.

On August 22, 1997, the magistrate filed a decision recommending that Angela be designated Quentin's residential parent and that Kevin be awarded extended visitation. On August 29, 1997, Kevin filed a request for findings of fact and conclusions of law. Findings of fact and conclusions of law were issued by the magistrate on January 8, 1998, pursuant to Civ.R. 53(E)(2). Specifically, the magistrate stated:

"Although the mother suffers from bouts of depression, she has sought and has been under medical care for her condition. The father does not have any medical conditions which preclude him from being a proper parent. However, his testimony and demeanor reflected a strong bitterness toward his wife regarding her alleged affairs. This bitterness has and will continue to interfere with parenting decisions. The mother will be the parent who is more likely to facilitate court-ordered visitation and companionship rights * * *."

On January 21, 1998, Kevin filed objections to the magistrate's decision. Kevin contended that the magistrate's decision was not supported by the evidence, that the magistrate erred by admitting hearsay testimony by Angela's witnesses, and that the magistrate erred by refusing to admit evidence of Angela's alleged extramarital affairs.

On June 12, 1998, the trial court issued a decision overruling Kevin's objections and adopting the magistrate's recommendations. In its entry, the trial court noted:

"Since the father did not file a counterclaim, the magistrate decided that evidence of [the] mother's alleged adultery was not relevant unless it could be shown that such misbehavior had an affect [*sic*] on the mother's ability to care for the child. * * * The court finds that the magistrate's ruling was reasonable and appropriate under the circumstances.

"The father also contends that the magistrate admitted hearsay testimony regarding the minor child. At the hearing, both parties presented hearsay testimony concerning their child. It does not appear that this hearsay evidence had any effect on the magistrate's decision."

On June 24, 1998, a decree of divorce, which incorporated the June 12, 1998 entry, was filed. Two days later, Kevin filed a motion for a new trial, alleging newly discovered evidence. Kevin asserted that Angela had concealed acts of misconduct during the divorce action, that she had plotted to have him murdered, that she had given birth to another child, and that she changed her place of employment, thereby creating a change of circumstances sufficient to warrant a new trial. On November 5, 1998, the trial court filed an entry overruling Kevin's motion. Appellant (Kevin) then brought this appeal, raising five assignments of error.

Assignment of Error No. 1:

"The trial court erred in excluding evidence of [appellee's] adultery and other misconduct."

In his first assignment of error, Kevin contends that the trial court should have admitted evidence of Angela's alleged extramarital affairs because such evidence related to Quentin's best interest. Kevin asserts that Angela's alleged affairs have and will continue to take time and attention from Quentin. Kevin cites *Wilder v. Wilder* (Feb. 5, 1985), Franklin App. No. 84AP–604, unreported, 1985 WL 9844, in support of the proposition that "[l]iving in a sexual relationship with an unrelated person of the opposite sex reflects adversely on a person's character and, thus, is a factor to be considered in the determination of custody."

A more appropriate standard for considering the alleged moral impropriety of a parent in a custody dispute has been stated as follows:

"Concern for a child's well-being or best interests does not * * * provide the court *carte blanche* to judge the rights and lifestyles of parents by nonstatutory codes of moral or social values. Although a court is not obliged to wear blinders as to a parent's lifestyle and/or morals, including sexual conduct, any state interest in competing lifestyles and accompanying moral values which affect child custody would most equitably be served if limited to a determination of the direct or probable effect of parental conduct on the physical, mental, emotional, and

social development of the child * * *." *Rowe v. Franklin* (1995), 105 Ohio App.3d 176, 179, 663 N.E.2d 955, 956–957.

▮ Under the "direct impact" test, as articulated in *Rowe,* the court may consider moral principles, but only in relation to the direct or probable effect of the parent's conduct on the child.

Our review of the record reveals that the trial court conducted the proper inquiry. When, prior to the hearing, appellant indicated that he planned to introduce testimony concerning appellee's alleged extramarital affairs, the court ruled that such testimony would be admissible only if "substantially relevant to the best interest of the minor child." Each time the matter was raised during the hearing, the court instructed appellant's counsel that such evidence would be admissible only if shown to have directly affected Quentin's best interest.

Appellant failed to establish a connection between appellee's alleged extramarital affairs and Quentin's well-being. Accordingly, the trial court properly struck all such testimony.[1] Appellant's first assignment of error is overruled.

Assignment of Error No. 2:

"The magistrate and the trial court erred in admitting hearsay statements of Quentin Tyler Arnold."

In his second assignment of error, appellant contends that the trial court erred by admitting statements made by Quentin when Quentin was available to testify. Appellant asserts that the trial court was required to conduct a voir dire of Quentin, then six years old, to determine whether he was competent to testify.

We can discern no basis under Ohio law for the magistrate's ruling on this issue. When appellant attempted to challenge the hearsay statements, the magistrate made a blanket ruling that six-year-old children were not permitted to testify in court. As a result, any statements attributable to Quentin were ruled admissible via hearsay testimony. This ruling is directly contrary to the Rules of Evidence.

▮ Evid.R. 601(A) provides that every person is competent to be a witness except "[t]hose of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Although the competency of individuals who are ten years old or older is presumed, the competency of those

---

1. Although the court's ruling was legally correct as applied to the limited evidence that was actually before it, we realize that our ruling on the second assignment of error could allow additional testimony to be received. We recognize the possibility that additional testimony may establish that appellee's alleged adultery did, in fact, have a direct, adverse impact on Quentin's well-being.

under ten years old must be established. *State v. Clark* (1994), 71 Ohio St.3d 466, 469, 644 N.E.2d 331, 334. "[I]n determining whether a child under ten is competent to testify, the trial court must * * * [consider]: the child's ability to receive accurate impressions of fact, the child's ability to recollect * * *, the child's ability to communicate what is observed, the child's understanding of truth and falsity, and the child's appreciation of his or her responsibility to tell the truth." *Id.*, citing *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483, syllabus, certiorari denied (1992), 503 U.S. 941, 112 S.Ct. 1488, 117 L.Ed.2d 629. Therefore, where a party seeks to present testimony from a child under ten years of age, that party must be given an opportunity to establish that the child is competent to testify.

In this case, the magistrate admitted hearsay statements, not because the statements fell within an exclusion or exception to the hearsay rule, but because the court found that the child was unavailable to testify. Our review of the record indicates that none of the statements falls within the hearsay exceptions listed in Evid.R. 804. Therefore, whether Quentin was "unavailable" is immaterial in this case. Therefore, we look to Evid.R. 803, which provides exceptions to the hearsay rule where the availability of the declarant is immaterial.

Our review of the entire record reveals that a total of the twenty-four hearsay statements were admitted at the hearing. However, only two of these statements were properly admissible under the Rules of Evidence.

Evid.R. 803 provides the following hearsay exception:

"(3) * * * A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

We disagree with the dissent here with respect to the second assignment of · error, regarding exactly what types of statements fall within the state-of-mind exception in Evid.R. 803(3). Under the reasoning of the dissent, nearly all of the hearsay statements fall within the Evid.R. 803(3) exception because the statements "reflected" the fact that Quentin was "afraid." The dissent cites *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21–22, 514 N.E.2d 394, 397–398, to support its reasoning. However, a close reading of *Apanovitch*, its progeny, and the clear language of Evid.R. 803(3) yield a contrary result.

First, the exception provided in Evid.R. 803(3) applies to a "statement *of* the declarant's then existing state of mind" not to any statement that "reflects" on the declarant's state of mind. To be included under this exception, the statement must directly refer to the then-existing, subjective qualities of the

declarant. Including any statement that may "reflect" on the declarant's state of mind extends the scope of the exception well beyond that which is clearly provided by the language of the rule.

Second, in *Apanovitch*, the Ohio Supreme Court followed the reasoning of *United States v. Cohen* (C.A.5, 1980), 631 F.2d 1223. In *Apanovitch*, the court explained that statements that the declarant was "scared" or that the declarant was "anxious" are admissible. *Apanovitch* 33 Ohio St.3d at 21–22, 514 N.E.2d 394, 397–398. However, the court clearly stated that "the state-of-mind exception does not permit witnesses to relate any of the declarant's statements as to why he held a particular state of mind. Accordingly, the witnesses were allowed to offer testimony that Cohen said, 'I'm scared,' but not 'I'm scared because Galkin threatened me.'" *Id.*, 33 Ohio St.3d at 21, 514 N.E.2d at 398 citing *Cohen* at 1225.[2]

■ In order to apply the *Apanovitch* rule to the current case, we will examine two specific hearsay statements that were admitted at the hearing. Jean Mitchell, a neighbor of Quentin's grandmother, testified that Quentin stated to her that he "does not want to go with his dad" and that "his dad is mean to him." Under the dissent's reasoning, both of these statements would be admissible because they "reflect" the fact that Quentin was afraid of being with appellant.

This confusion results because, when one reads the statements, it is easy to draw an inference regarding Quentin's state of mind. One is tempted to infer that these statements actually mean: "I'm upset, because I don't want to go with my dad," or "I'm afraid, because my dad is mean to me." We note that under *Apanovitch*, the first part of each statement would be admissible, namely, "I'm upset" or "I'm afraid." However, the second part, explaining why Quentin held the particular state of mind, is clearly inadmissible. Simply because one may be able to infer something about Quentin's state of mind from the alleged hearsay statements does not mean the statements fall within the state-of-mind exception. In fact, a reading of *Apanovitch* demands precisely the opposite result.

According to our count, there were twenty-four actual hearsay statements admitted at the hearing. However, many of the statements were repetitive, and, for our discussion, we have selected only those statements that represent each type of statement involved.

■ Crystal Noel, an acquaintance of appellee, testified that Quentin told her, "Daddy won't let me call Mommy," and that he "didn't want to go to Daddy's

---

**2.** The state-of-mind exception is intended to extend to the following type of statements: "I am afraid"; "I like Norb"; "I am depressed"; and "I am happy." Weissenberger, Ohio Evidence (1999), Chapter 803, at 352.

house." Jean Mitchell, a neighbor of Quentin's grandmother, testified that Quentin begged to "stay at his grandmother's house," and that "his dad is mean to him and pulled his hair." Similarly, Marilyn Kirchner, Quentin's grandmother, testified that Quentin said he would "never get to see" his grandmother and that he asked her about his mother's affair.

In addition, appellee testified that Quentin often begged "to go somewhere so we won't be home when Daddy comes." Appellee also testified that Quentin asked her, "Why don't anybody ever love on me when I go there, Mom?" As discussed above, none of these statements fits within the state-of-mind exception because none are statements of Quentin's then-existing subjective qualities.

■ Also presented at the hearing were several statements constituting hearsay within hearsay. Kirchner testified that Quentin said, "Daddy says Mommy slept with Butch Witherspoon." Similarly, according to appellee's testimony, Quentin stated that appellant said, "[H]e [Quentin] would never see Mom again, it was going to be like she was dead." Appellee also testified that Quentin stated that Kirchner had told him, "Your mom is a little bitch."

■ Under Evid.R. 805, to be admissible, both layers of hearsay (both Quentin's statement and the third-party's statement) must be admissible under one of the exceptions provided in the evidence rules. We find that none of Quentin's statements falls within an exception to the hearsay rule. Therefore, each of the double hearsay statements must be excluded on hearsay grounds.

■ Finally, Mitchell testified that Quentin told her that he "is afraid." Lorna Williams, a co-worker of appellee, stated that Quentin said he "was getting nervous." These two statements are admissible under the state-of mind exception in Evid.R. 803(3). However, our review of the record reveals that these two statements are the only statements that were properly admitted.

■ The Rules of Evidence were written to give a basic, fair trial to all litigants. Appellee, attempting to establish the child's best interest, presented hearsay statements against appellant. Appellant had a right to have Quentin testify, either in person if the child was found competent, or, if not, by proper hearsay testimony. The magistrate apparently attempted to circumvent the erroneous ruling by holding that appellant's animosity, rather than the hearsay testimony, was the crux of the decision. The trial court then adopted the magistrate's decision, stating, "It does not appear that this hearsay evidence had any affect [*sic*] on the magistrate's decision." However, this finding does not cure what occurred and does not remedy the fact that appellant did not have the complete and full hearing to which he was entitled.

Due to the extent of hearsay evidence that was improperly admitted in this case, we find that the magistrate's ruling constituted error, and that the error cannot be deemed harmless under Civ.R. 61. Accordingly, appellant's second assignment of error is sustained.

Assignment of Error No. 3:

"The findings of fact and conclusions of law failed to comply with Rule 52 in that it failed to find facts adequate to support the ruling of the court."

Assignment of Error No. 4:

"The findings and judgment of the trial court [are] against the manifest weight of the evidence."

Assignment of Error No. 5:

"The trial court erred in overruling the motion for a new trial."

Because our ruling on appellant's second assignment of error renders assignments of error three, four, and five moot, we decline to discuss those assignments of error. See App.R. 12(A)(1)(c). This matter is remanded to the trial court for a *de novo* hearing to determine custody.

*Judgment accordingly.*

WALSH, J., concurs separately.

WILLIAM W. YOUNG, J., concurs in part and dissents in part.

WALSH, Judge, concurring.

The dissent, with respect to the second assignment of error, states that "appellant made no attempt to establish Quentin's competency," and that "[a]t no time did appellant indicate that he wished to call Quentin as a witness, nor did he make an offer of proof as to Quentin's competence." By making these statements, it appears that the dissent has improperly shifted the burden of proof under the Rules of Evidence.

The burden of establishing that a statement falls within an exception or exclusion to the hearsay rule is upon the proponent of the evidence. See *State v. Riggins* (1986), 35 Ohio App.3d 1, 4, 519 N.E.2d 397, 402 (holding that the burden of establishing unavailability rests on the party offering the evidence). See, also, *State v. Rowe* (1993), 92 Ohio App.3d 652, 662, 637 N.E.2d 29, 36 (holding that the proponent of an elderly witness's deposition testimony bears the burden of proving her unavailability). Since appellee was the proponent of the hearsay statements and since the hearsay statements were offered against appellant, it is improper to hold that appellant bears the burden of proving Quentin's competen-

cy or availability in order to have the statements excluded. It is the proponent of the evidence, appellee, who bears the burden to prove that the statements are admissible.

In addition, I believe it is important to note the similarity of this case to *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256. *DeMarco* also involved multiple hearsay statements improperly admitted via the testimony of multiple witnesses at trial. Although *DeMarco* involved the conviction of a criminal defendant, the evidentiary analysis is nonetheless applicable within this civil context. In *DeMarco,* the Ohio Supreme Court held:

"In our view, the cumulative effect of these witnesses' hearsay testimony was prejudicial. Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." *Id.* at 196–197, 31 OBR at 395, 509 N.E.2d at 1261.

An error is harmless in a civil context if it "does not affect [the] substantial rights of the complaining party, or the court's action is not inconsistent with substantial justice." *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 164, 17 O.O.3d 98, 101, 407 N.E.2d 490, 494, citing Civ.R. 61. I find that this error affected the substantial rights of appellant and that the court's evidentiary rulings were not consistent with substantial justice.

The most important issue here is that appellant has the right to have a fair hearing. To ensure fairness, the litigants and the court must comply with Ohio's established evidentiary rules. Therefore, this matter must be remanded to the trial court for a custody hearing in compliance with the Ohio Rules of Evidence.

WILLIAM W. YOUNG, Judge, concurring in part and dissenting in part.

I concur in the majority's ruling on appellant's first assignment of error. Concerning appellant's second assignment of error, I agree with the majority that the ruling by the magistrate to deem Quentin unavailable, as well as the attendant attitude of the magistrate in making the ruling, should be strongly disapproved. I must respectfully dissent, though, because while such a ruling should be criticized, it was harmless in light of the substantial facts supporting the magistrate's and trial court's decisions awarding appellee residential custody of Quentin.

The majority is correct that the magistrate's blanket ruling was contrary to the spirit of the Rules of Evidence. Nonetheless, the majority fails to properly consider those issues that are central to a proper analysis of the effects of the magistrate's ruling. In light of the final decision of the magistrate, discussion of these issues demonstrates that the magistrate's erroneous ruling did not so affect

appellant's rights as to deprive him of the "complete and full hearing to which he was entitled."

First, the majority references Evid.R. 601 without providing any application of the rule to the facts of this case. Under Evid.R. 601,[3] the competency of a child under ten years of age must be established. The majority is correct that when a party seeks to present the testimony of a child under ten years of age, that party must be given the opportunity to establish the child's competence to testify. *State v. Clark* (1994), 71 Ohio St.3d 466, 469, 644 N.E.2d 331, 334.

The magistrate's ruling deemed Quentin unavailable to testify by declaring him incompetent, but appellant made no attempt to establish Quentin's competency. In fact, the discussions between the magistrate and appellant's counsel demonstrate that appellant was not attempting to present any testimony by Quentin. At no time did appellant object to this ruling by the trial court. In his brief before this court, appellant concedes that "[Quentin] Tyler would not, probably, be a competent witness, due to his age and susceptibility." Before the magistrate, appellant sought only to challenge subsequent hearsay testimony presented by appellee. At no time did appellant indicate that he wished to call Quentin as a witness, nor did he make an offer of proof to establish Quentin's competence.

Thus, the majority's decision that the trial court's ruling prevented appellant from being able to examine Quentin regarding the hearsay testimony presented by appellee is not supported by the record. Before one could reach such a conclusion, one would have to find that appellant sought to call Quentin to testify, and there is nothing in the record to support such a conclusion. The majority's finding that a substantial right of appellant, to cross-examine hearsay testimony, was affected is predicated on its *assumption* that appellant would call Quentin as a witness. In short, even though appellant failed to assert this right in the proceedings below, the majority is now asserting this right on his behalf.

The majority apparently determined that the hearsay statements admitted were central to the magistrate's final decision on custody, even though the record contradicts any such conclusion. The majority states:

"The magistrate apparently attempted to circumvent the erroneous ruling by holding that appellant's animosity, rather than the hearsay testimony, was the crux of the decision. The trial court then adopted the magistrate's decision,

---

3. Evid.R. 601 states:
  "Every person is competent to be a witness except:
  "(A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

stating, 'It does not appear that this hearsay evidence had any affect [*sic* ] on the magistrate's decision.' "

Both the magistrate and the trial court issued unambiguous expressions of their decisions and the reasons for their decisions. A trial court "speaks through its entry" and "[w]e must accept the judgment entry as a correct and unambiguous expression of the trial court's resolution" of the case. *Norton v. Liapis* (Sept. 27, 1999), Butler App. No. CA99–03–068, unreported, 1999 WL 760916.

A proper analysis of the effect of the admitted hearsay statements upon the proceedings below demonstrates that no substantial right of appellant was so affected as to require a new hearing. The majority is correct that twenty-four hearsay statements were admitted as a result of the magistrate's declaration that Quentin was unavailable. Much of this hearsay testimony concerned statements by Quentin that reflected his then-existing state of mind or emotions.

Hearsay statements that reflect the declarant's then-existing mental, emotional, or physical condition are admissible pursuant to Evid.R. 803,[4] the declarant's availability being immaterial. Much of the admitted hearsay testimony concerned statements by Quentin that he was either afraid of appellant or that he did not want to visit with appellant. The majority reasons that these statements are inadmissible because they "reflect" Quentin's state of mind, rather than being statements "of" his state of mind. Such a distinction seems to go against case law and the very purposes of Evid.R. 803(3).

Under the majority's reasoning, unless a declarant uses the proper words to convey his or her state of mind, the statements are not admissible. Other courts have consistently found otherwise. In *State v. Awkal* (1996), 76 Ohio St.3d 324, 331, 667 N.E.2d 960, 967, certiorari denied (1997), 519 U.S. 1095, 117 S.Ct. 776, 136 L.Ed.2d 720, the Supreme Court of Ohio, discussing *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394, stated:

"[In *Apanovitch*], this court discussed the admissibility of evidence *reflecting* a victim's fearful state of mind. However, the court limited this type of testimony to that *reflecting* the state of mind of the victim, but not the reasons underlying that state of mind." (Emphasis added.) *Awkal,* 76 Ohio St.3d at 331, 667 N.E.2d at 967.

---

4. Evid.R. 803 states:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

" * * *

"(3) Then existing, mental, emotional, or physical condition

"A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

This reasoning is in accord with earlier decisions. In *State v. Simko* (1994), 71 Ohio St.3d 483, 491, 644 N.E.2d 345, 353, certiorari denied (1995), 516 U.S. 831, 116 S.Ct. 103, 133 L.Ed.2d 57, the Supreme Court affirmed the decision of an appellate court that upheld admission of statements that were " 'arguably relevant' to show that appellant was distraught and that he was following Mary Jane Johnson on the night before the shooting * * *." The court found that the admission of such evidence under Evid.R. 803(3) was "supportable." *Id.* This testimony included statements that the victim was scared and that she had changed her telephone number because appellant had continued to call her, even after being told to stop. *Id.* at 491, 644 N.E.2d at 352.

Even in *Apanovitch,* which the majority cites, the Supreme Court of Ohio noted that statements "to the effect" that the declarant was scared or apprehensive are admissible. *Id.* 33 Ohio St.3d at 21, 514 N.E.2d at 398. Nothing in these cases, or in the purpose of Evid.R. 803(3)—to admit otherwise reliable and spontaneous statements reflecting the declarant's state of mind—seem to support the majority's assertion that it is the words used, not the state of mind conveyed, that governs admissibility.

With this in mind, that hearsay testimony reflecting Quentin's then-existing mental or emotional state was admissible. The hearsay statements reflected Quentin's fear of being with appellant and his apprehension of leaving with appellant. It would seem that in a custody dispute, the child's fear of leaving to visit with his father would be a central concern of the trial court. The majority does not dispute this concern, instead, only stating that Quentin apparently used the wrong words to convey his fears and that his statements should therefore, have been excluded. I disagree.

This leaves fifteen allegedly improper hearsay statements. Of these, some were statements by Quentin that he did not feel loved, clearly an expression of his then-existing state of mind and emotion under Evid.R. 803(3). Another statement was a question by Quentin concerning appellee's alleged affairs, which was admitted for the fact that Quentin asked the question, not that appellee had affairs. This last statement was not being offered for the matter asserted and did not fall within the definition of hearsay in Evid.R. 801(C).[5]

Pursuant to Evid.R. 403(A),[6] hearsay testimony that is otherwise admissible may be excluded if its probative value is "substantially outweighed" by its danger

5. Evid.R. 801(C) states:
" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

6. Evid.R. 403(A) states:

of unfair prejudice. Without question, testimony that Quentin was afraid of being with appellant, or that Quentin felt unloved, would weigh against appellant because it would tend to demonstrate that giving appellant residential custody of Quentin would not be in Quentin's best interest. However, these statements go directly to Quentin's best interest, and it cannot be said that they "unfairly prejudice" appellant.

The remaining hearsay statements concerned past actions, accusations, or alleged threats made by appellant that would be excluded either by Evid.R. 805 [7] as improper double hearsay or by the *Apanovitch* rule cited by the majority. The majority is correct in finding that the admission of these statements was error. Nonetheless, in light of the findings of the magistrate and trial court that appellant's own demeanor reflected that he would not support appellee's visitation and companionship rights, this hearsay testimony did not create such unfair prejudice as to deprive appellant of a fair hearing.

Appellant's testimony before the magistrate showed an obsession with appellee's past extra-marital affairs and open hostility toward her as a result of this obsession. It was clear to the magistrate that, based upon this testimony, appellant would not be the parent most likely to honor visitation and companionship rights. Even though the admission of some of the hearsay was erroneous, appellant's own testimony, in and of itself, supports the magistrate's decision.

Other evidence presented at the hearing before the magistrate supported the magistrate's final decision. Appellee presented testimony that she would make the better residential parent. Appellee is presently Quentin's primary caregiver. She had recently changed her work hours so that she could spend more time with Quentin. Although appellee admitted to suffering from bouts of depression, she has sought medical treatment for this condition. In addition, there was evidence that Quentin often returned from his visits with appellant feeling hostile and withdrawn.

In light of appellee's nonhearsay evidence and the hostile demeanor of appellant's testimony, the magistrate's ruling that Quentin was not available to testify was harmless. Civ.R. 61.[8] The trial court reached this exact conclusion. The

---

"Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

**7.** Evid.R. 805 states:

"Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

**8.** Civ.R. 61 states:

trial court reviewed the objections to the magistrate's decision filed by appellant and considered the evidence presented before the magistrate. The trial court ruled that it was clear that the magistrate did not base the decision upon the hearsay presented, but upon appellant's own testimony and demeanor. The judgment of the magistrate and that of the trial court are both unambiguous and supported by the record. We are required to accept them as correct statements of the reasons for the decisions below. *Norton v. Liapis.*

This court should not criticize the magistrate's decision at the expense of a proper analysis and resolution of the issues presented for our review. I must respectfully dissent from the majority's resolution of appellant's second assignment of error.

I would also address appellant's third, fourth, and fifth assignments of error, rather than deeming them moot. I would hold that the findings of fact challenged in appellant's third assignment of error, those relating to appellant's hostility toward appellee, have support in the record. With regard to appellant's fourth assignment of error, I would find that the judgment of the magistrate and trial court were not against the manifest weight of the evidence, especially in light of the substantial evidence presented by appellee that she would make the better residential parent and the testimony of appellant demonstrating his obsessive and hostile attitude towards appellee.

As to appellant's fifth assignment of error, I would find that the trial court properly overruled appellant's motion for a new trial. Appellant argues that he presented evidence that appellee had engaged in misconduct after the final hearing and that she allegedly had hired someone to kill him. Appellant also raised the errors asserted in his first four assignments of error in this appeal. The trial court found appellant's claims to be unsubstantiated or without merit, and I would affirm the trial court's decision to overrule appellant's motion for a new trial.

Accordingly, I would affirm the judgment of the trial court.

---

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."