**ANDERSON, Appellee,**

v.

**ANDERSON, Appellant.**

Court of Appeals of Ohio,
Seventh District, Carroll County.

No. 01 AP 755.

Decided March 12, 2002.

514

Joseph I. Tripodi, for appellee.

Arnold F. Glantz, for appellant.

WAITE, Judge.

{¶ 1}   This timely appeal arises from the parties' divorce decree.   Colleen M. Anderson ("appellant") takes issue with the trial court's decision to award custody of their two children to Robert Keith Anderson ("appellee"), and with the order that no unrelated male companion would be allowed to be present during her visitation periods.   Appellant also questions the valuation of the marital residence and the child support computation.   As the record before us does not support a finding that there would be a direct adverse impact on the children if an unrelated male was present during visitation, this part of the divorce decree is reversed and remanded for further proceedings.   The record does support the trial court's judgment as to the remaining assignments of error.

{¶ 2} The parties were married on July 28, 1990. Two children were born during the marriage: Kourtney Anderson, born on February 11, 1991, and Brandon Anderson, born on December 30, 1994. During the marriage, appellant also had custody of Frank Gairo, a teenage son from a previous marriage.

{¶ 3} On January 4, 2000, appellee filed a complaint in divorce in the Carroll County Court of Common Pleas. Appellee sought custody of Kourtney and Brandon. On February 3, 2000, appellant filed her answer. On April 11, 2000, appellant filed an amended answer, in which she admitted appellee's allegation that she had committed adultery.

{¶ 4} The case came to trial on June 20, 2000, and was continued to July 25, 2000.

{¶ 5} After trial, each party filed a proposed written statement of facts and conclusions of law, including separate copies of the child support calculation worksheet contained in former R.C. 3113.215(E).

{¶ 6} On February 20, 2001, the trial court filed it opinion, judgment entry, and decree of divorce. The court awarded custody of the children to appellee, with standard visitation rights being granted to appellant. The court, though, prohibited Ken Joseph, "or any other unrelated male individual," from being present during visitation. Ken Joseph was appellant's supervisor during her employment as an emergency medical technician.

{¶ 7} The court found that the marital residence was worth $95,000. The court also ordered appellant to pay monthly child support of $155 per child.

{¶ 8} Appellant filed this timely appeal on March 16, 2001.

{¶ 9} Appellant presents four assignments of error in this appeal.

{¶ 10} The first two assignments of error are based on the same legal arguments and will be treated together:

{¶ 11} "The trial court erred in prohibiting Ken Joseph 'or any other unrelated male individual' to be present during appellant's companionship with her children.

{¶ 12} "The trial court erred in awarding custody of the children to appellee where the court failed to consider if appellant's extramarital affairs had a 'direct adverse impact' on them."

## 1. Visitation.

{¶ 13} Appellant argues that the trial court overstepped its authority by including the following language in the February 20, 2001 entry: "[Appellant] shall not permit Ken Joseph, or any other unrelated male individual, to be present during her periods of companionship with the children." Appellant

contends that this part of the visitation order is the trial court's method of punishing her for the alleged immorality of her relationships with Ken Joseph and other men. Appellant argues that "[a] court's inquiry into the moral conduct or standards of a custodial parent is limited to a determination of the effect of such conduct on the child." *Whaley v. Whaley* (1978), 61 Ohio App.2d 111, 15 O.O.3d 136, 399 N.E.2d 1270, paragraph three of syllabus. Appellant asserts that a number of Ohio's courts have adopted the "direct adverse impact" test in child custody cases, which states: "The direct adverse impact test allows the court to consider moral principles, but only in relation to the direct or probable effect of the parent's conduct on the child." *Rowe v. Franklin* (1995), 105 Ohio App.3d 176, 180, 663 N.E.2d 955.

{¶ 14} Appellant argues that *Whaley* and *Rowe* also apply to court orders affecting visitation rights. Appellant relies exclusively on cases from foreign jurisdictions in making this contention. See *Draper v. Draper* (Fla.App.1980), 403 So.2d 989; *Gallo v. Gallo* (1981), 184 Conn. 36, 440 A.2d 782; *In re Marriage of Hanson* (1983), 112 Ill.App.3d 564, 68 Ill.Dec. 268, 445 N.E.2d 912. Appellant argues that there is no evidence in the record tending to show that her relationship with Ken Joseph, or with any other man, had any adverse impact on her children. Appellant contends that even the custody evaluation produced by social worker Catherine Ries, which recommended granting custody to appellee, did not recommend any restrictions on male visitors being present during appellant's visitation with her children.

{¶ 15} Appellant further argues that the prohibition on any unrelated male visitors being present during visitation is impossibly broad. Appellant cites two cases from foreign jurisdictions in support. *Moreau v. Moreau* (La.App.1982), 422 So.2d 734; *Dile v. Dile* (1981), 284 Pa.Super. 459, 426 A.2d 137. Appellant argues that the effect of the order is that no visitation can take place with male casual friends, ministers, doctors, church members, school teachers, appellant's attorney, or even with appellee, because he is no longer related to appellant after the divorce.

{¶ 16} Appellee presents no arguments directly rebutting appellant's contention that the "direct adverse impact" standard is a proper legal standard to use in evaluating the visitation order. Instead, appellee maintains that (1) visitation determinations are reviewed only for abuse of the trial court's discretion; (2) neither party presented testimony as to "direct adverse impact"; (3) appellant previously agreed to exclude Ken Joseph from visitation (see 3/7/2000 pretrial judgment entry); (4) evidence was presented that appellant was often away from home during the night or for days at a time; and (5) Frank Gairo, appellant's son by a previous marriage, was threatened by Ken Joseph. Appellee concludes that

these facts support that the trial court did not abuse its discretion in the visitation order.

{¶ 17} Appellant's assignment of error has merit, in part, because the order prohibiting visitation while any unrelated male visitor is present is not supported by the record and because it is not clear that the proper legal standard was applied.

{¶ 18} The standard of review for matters concerning visitation rights is whether the trial court committed an abuse of discretion. *Booth v. Booth* (1989), 44 Ohio St.3d 142, 144, 541 N.E.2d 1028; *Corple v. Corple* (1997), 123 Ohio App.3d 31, 36, 702 N.E.2d 1234. An abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. In order to further the child's best interest, the trial court has the discretion to limit or restrict visitation rights. *Jannetti v. Nichol* (May 12, 2000), Mahoning App. No. 97 CA239, 2000 WL 652540. "This includes the power to restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child." Id.

{¶ 19} The visitation rights of the nonresidential parent are governed by R.C. 3109.051. *Braatz v. Braatz* (1999), 85 Ohio St.3d 40, 44, 706 N.E.2d 1218. A trial court must consider the fifteen factors listed in R.C. 3109.051(D) and has the discretion to then determine a visitation schedule and visitation restrictions which are in the best interests of the child.

{¶ 20} There are numerous cases adopting the "direct adverse impact" test as appropriate in child custody determinations, and we have applied the test in this appellate district. See, e.g., *Layne v. Layne* (Nov. 5, 2001), Brown App. No. CA2001–01–001 (12th District), 2001 WL 1359784; *Dilworth v. Dilworth* (1996), 115 Ohio App.3d 537, 541, 685 N.E.2d 847 (2d District); *Rowe,* supra, 105 Ohio App.3d at 180, 663 N.E.2d 955 (1st District); *Figley v. Figley* (Nov. 14, 1990), Columbiana App. No. 90–C–31 (7th District); *Whaley,* supra, 61 Ohio App.2d at 119, 15 O.O.3d 136, 399 N.E.2d 1270 (4th District). The Ohio Supreme Court has cited the doctrine with approval, but has not yet addressed whether it applies to visitation orders. See *In re Adoption of Charles B.* (1990), 50 Ohio St.3d 88, 92, 552 N.E.2d 884 ("direct adverse impact" test is relevant in determining whether adoption should be approved where adoptive parent was having homosexual relationship); *In re Burrell* (1979), 58 Ohio St.2d 37, 39, 12 O.O.3d 43, 388 N.E.2d 738 (in the absence of evidence showing a detrimental impact, the fact that the mother had a live-in boyfriend did not warrant the state in removing the child from parental custody without a showing of detrimental impact).

{¶ 21} We have found only one case in Ohio that has applied the "direct adverse impact" test to a visitation order. *Conkel v. Conkel* (1987), 31 Ohio App.3d 169, 31 OBR 335, 509 N.E.2d 983. In *Conkel,* the Fourth District Court of Appeals held that a homosexual father could not be denied overnight visitation with his two sons on the basis of his homosexuality, absent evidence that visitation would be harmful to the boys or that the boys would be psychologically or physically harmed. Id. at 172, 31 OBR 335, 509 N.E.2d 983. "[W]hether the issue is custody *or visitation,* before depriving the sexually active parent of his crucial and fundamental right of contact with his child, a court must find that the parent's conduct is having, or is probably having, a harmful effect on the child." (Emphasis added). Id.

{¶ 22} There seems to be no appreciable difference in applying the "direct adverse impact" test to both visitation orders and custody orders. The nonresidential parent has a fundamental and natural right to visitation. *Johntonny v. Malliski* (1990), 67 Ohio App.3d 709, 712, 588 N.E.2d 200; *Pettry v. Pettry* (1984), 20 Ohio App.3d 350, 20 OBR 454, 486 N.E.2d 213, paragraph one of syllabus. The child also has a fundamental right to visitation with the nonresidential parent. *Porter v. Porter* (1971), 25 Ohio St.2d 123, 54 O.O.2d 260, 267 N.E.2d 299, paragraph three of syllabus. When a court significantly interferes with this fundamental right on the basis that the parent is living an "immoral" lifestyle, it would be natural to conclude that the court was using visitation to punish the noncustodial parent because of the court's view of morality. The "direct adverse impact" test ensures that a trial court's denial or severe restriction on visitation will be based on objective criteria, rather than merely on the personal moral code of the trial judge.

{¶ 23} Applying the "direct adverse impact" test to the case sub judice, we find nothing in the February 20, 2001, judgment entry explaining why appellant was prohibited from having unrelated male visitors present during visitation. The judgment entry, in discussing child custody, does make the following comment on appellant's morals:

{¶ 24} "Her repeated willingness to engage in numerous extramarital affairs during both of her marriages, while not evidence *per se* of extreme moral impropriety * * * does reflect consistent poor judgment and impulsiveness, and raises questions regarding her long-term parenting skills."

{¶ 25} The judgment entry goes on to make further observations about appellant's past and current "affairs." The record also shows that appellant admitted in her answer to the divorce complaint that she had committed adultery. Although the record does not explicitly state that appellant's adulterous relationship was with Ken Joseph, there is some evidence to support this conclusion,

including evidence of numerous phone calls between the two of them. It is difficult to escape the conclusion that the restrictions placed on appellant's visitation rights were primarily based on the court's attitude towards her extramarital relationships, particularly her relationship with Ken Joseph.

{¶ 26} The record contains some slight evidence about Ken Joseph that could support the trial court's decision excluding him from visitation. Appellant's mother, Mary Long Mullen, testified that Ken Joseph threatened her in the hallway of the courthouse:

{¶ 27} "Q. [Appellee's Attorney] Okay. While you were here the last time and out in the hall of this court did anybody—strike that. Did anything unusual happen to you?

{¶ 28} "A. Well, yes, I was trying to talk to my daughter and Colleen's boss, Ken, really didn't want me to talk to her by myself, just with her. He kept interrupting. Uh, and the other thing was—

{¶ 29} "Q. Did he say anything directly to you?

{¶ 30} "* * *

{¶ 31} "A. Yes, he like, just about, he threatened me.

{¶ 32} "Q. What did he say?

{¶ 33} "A. Well, he said to me, because I said I'd like to talk to my daughter and he said uh, and I said I'd like you to leave me alone because I don't want to start any trouble and he said if you want trouble I can give you trouble, all the trouble you want."

{¶ 34} Frank Gairo testified about a phone conversation he had with Ken Joseph:

{¶ 35} "Q. [Appellee's Attorney] Did you ever receive a phone call at your house after your mother was there one evening?

{¶ 36} "A. Yes, I did.

{¶ 37} "Q. From whom?

{¶ 38} "A. Ken Joseph.

{¶ 39} "Q. And do you recognize his voice?

{¶ 40} "A. Oh, yes.

{¶ 41} "* * *

{¶ 42} "Q. And what did he, what did he say to you that night?

{¶ 43} "A. What my step-dad did to my mom was not the right thing to do and that he was going to get her out and anything he had to do he was going to

do to get her out and that dad shouldn't have done that and he is not a very good man for doing that."

{¶ 44} This testimony could support a conclusion that it would be harmful for Ken Joseph to have contact with the children. Mr. Joseph threatened appellant's own mother, and engaged in a highly inappropriate phone conversation with appellant's son in which he denigrated appellee. Although this evidence is minimal, it cannot be said that the trial court was completely arbitrary in prohibiting Ken Joseph from being present at visitation due to the possibility of harm which could come from his presence.

{¶ 45} On the other hand, there is no evidence to support the exclusion of any other unrelated male from visitation. Furthermore, appellant's argument that this prohibition is exceedingly broad is well taken. Given the importance of the nonresidential parent's right of visitation, restrictions on visitation should be tailored to fit the specific concern that the trial court is attempting to address, and the need for the visitation restrictions must be supported by the record.

{¶ 46} For the reasons stated, we sustain appellant's first assignment of error. Although appellant would have this court simply modify the judgment entry by striking the language at issue, we must reverse and remand this case so that a new visitation order may be entered.

{¶ 47} Neither the judgment entry nor the remainder of the record supports that the visitation factors set forth in R.C. 3109.051 were considered. Although there is some evidence in the record that may support visitation restrictions with respect to Ken Joseph, there is no indication that the trial court relied on these facts in making its decision. The trial court is primarily responsible for making factual determinations. Thus, we must remand the issue so that the trial court may reevaluate the facts relating to visitation in light of this opinion and the applicable law.

### 2. Custody.

{¶ 48} Appellant also argues that the trial court failed to use the "direct adverse impact" test in making its custody determination. Appellant asserts that the trial court decided to grant custody of the children to appellee because of appellant's extramarital affairs. Appellant argues that, in adverse child custody proceedings, a trial court abuses its discretion when, in addressing a parent's nonmarital sexual conduct, the court fails to consider whether such conduct has had a direct adverse impact on the children. *Rowe,* supra, 105 Ohio App.3d at 181, 663 N.E.2d 955.

{¶ 49} Appellant points out that there was no evidence of neglect or abuse, and that the children got along well with both parents.

{¶ 50} Appellee argues that the trial court based its child custody decision not on appellant's affairs per se but on her poor judgment and impulsiveness, on deficiencies in her parenting skills, and on the family instability caused by her extramarital affairs. Appellee also points out that the court's judgment entry, and the record in general, reveal the negative impact of appellant's lifestyle on the children. Appellant would come home late at night or not at all, did not leave a forwarding phone number when she was with one of her companions at a hotel in Zanesville, spent most of 1999 away from home and constantly left the children with babysitters or with their grandparents. She also left her teenage son, Frank Gairo, home alone or with strangers when she went off to meet a boyfriend, and would not tell Frank where she was going.

{¶ 51} Appellee cites some additional facts in support of the trial court's decision, although these facts were not cited in the court's judgment entry: Appellant often lost her temper and screamed at the children; appellant grabbed her children and threw them on the couch, leaving marks on their arms and legs; and appellee acted as the primary caretaker of the children.

{¶ 52} Appellee concludes that this evidence is sufficient to show that the trial court did not abuse its discretion in awarding custody of the children to him.

{¶ 53} As to this issue, we hold that appellant's argument is without merit and that the trial court applied the correct legal standards in awarding custody to appellee.

{¶ 54} When a trial judge makes a decision regarding the custody of children and when the decision is supported by a substantial amount of competent and credible evidence, the decision will not be reversed absent an abuse of discretion. *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus. While a trial court's discretion in a custody proceeding is broad, it is not absolute, and the trial court must follow the procedure described in R.C. 3109.04. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846. R.C. 3109.04(A)(1) dictates that, in an initial custody award, the trial court shall be guided exclusively by the best interests of the children. The statute sets forth a nonexclusive list of factors that the trial court must consider in evaluating the best interests of the children:

{¶ 55} "(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

{¶ 56} "(a) The wishes of the child's parents regarding the child's care;

{¶ 57} "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the

allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

{¶ 58} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

{¶ 59} "(d) The child's adjustment to the child's home, school, and community;

{¶ 60} "(e) The mental and physical health of all persons involved in the situation;

{¶ 61} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

{¶ 62} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

{¶ 63} "(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

{¶ 64} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

{¶ 65} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state." R.C. 3109.04(F)(1)(a through j).

{¶ 66} As outlined earlier, in making a custody determination, the "direct adverse impact" test dictates that a court's inquiry into the moral conduct of a parent should be limited to the adverse effects of such conduct on the child. *Whaley,* supra, 61 Ohio App.2d at 119, 15 O.O.3d 136, 399 N.E.2d 1270. It is

apparent from the February 20, 2001, entry that the trial court was well aware of this test. It is also apparent that the trial court applied the "direct adverse impact" test, as well as the "best interest" factors listed in R.C. 3109.04(F), in making its decision.

{¶ 67} The court's awareness of the "direct adverse impact" test is evident by its reliance, in part, on *Arnold v. Arnold* (1999), 135 Ohio App.3d 465, 734 N.E.2d 837, which held that testimony about a wife's extramarital affairs was properly excluded because it did not meet the requirements of the direct adverse impact test. *Id.* at 469–470, 734 N.E.2d 837.

{¶ 68} The trial court emphasized the harmful effects of appellant's lifestyle, rather than the immorality of her affairs. The court determined that appellant's lifestyle created an unstable environment for the children which raised questions about her parenting skills. The court found that the best interest factors found in R.C. 3109.04(F)(1)(g) through (j) did not apply to this case. The court also found that both parents wanted sole custody; that the children were well-adjusted to their school and community; that the children relate well with both parents, with appellant's son Frank Gairo and with the grandparents; that there was no evidence of abuse or neglect; that both parents were likely to facilitate visitation; and that both parents had acted as primary caregiver at different times.

{¶ 69} Given the trial court's careful evaluation of the R.C. 3109.04(F)(1) factors and its appropriate application of the "direct adverse impact" test, there was no abuse of discretion in awarding custody of the children to appellee. Appellant's second assignment of error is, therefore, overruled.

{¶ 70} Appellant's third assignment of error contends:

{¶ 71} "The trial court's finding that the marital residence had a fair market value of $95,000 was against the manifest weight of the evidence."

{¶ 72} Appellant argues that there is no credible explanation as to why the trial court chose to accept the very low appraisal of William Newell, a long-time acquaintance of appellee, over two seemingly neutral appraisals that valued the marital residence much higher.

{¶ 73} Appellee argues that Newell testified extensively in support of his appraisal, pointing out the following defects that he had found in the home: (1) the house was very old, (2) the basement was unfinished and had excessive water leaking into it, (3) the home had an old furnace, and (4) the upstairs of the home was unfinished. The appraisal itself pointed out that (1) the front porch was unfinished, (2) the well and septic system were old, and (3) the workshop was unfinished. Based on this evidence, appellee concludes that it was within the trial

court's discretion to adopt the valuation used in Newell's appraisal. We must agree with appellee's argument.

{¶ 74} Trial courts have broad discretion in deciding appropriate property awards in divorce cases. See, e.g., *Berish v. Berish* (1982), 69 Ohio St.2d 318, 319, 23 O.O.3d 296, 432 N.E.2d 183. Valuation is typically a factual issue left to the discretion of the trier of fact. *Conti v. Christoff* (Oct. 2, 2001), Mahoning App. No. 99CA84 and 99CA327, 2001 WL 1199056; *Hacker v. Hacker* (1981), 5 Ohio App.3d 46, 47, 5 OBR 50, 448 N.E.2d 831. "The common pleas court is not required to adopt the valuation of any witness, but is instead vested with wide discretion to determine the weight of the evidence and the credibility of witnesses." *Murray & Co. Marina, Inc. v. Erie Cty. Bd. of Revision* (1997), 123 Ohio App.3d 166, 173, 703 N.E.2d 846. Additionally, the trier of fact is not bound by the appraisal or valuation methodology used by any expert witness. Id. at 173, 703 N.E.2d 846; *Youngstown Sheet & Tube Co. v. Mahoning Cty. Bd. of Revision* (1981), 66 Ohio St.2d 398, 402, 20 O.O.3d 349, 422 N.E.2d 846. Although the trial court is granted great leeway in obtaining a value for property, its valuation must be based on evidence. *McCoy v. McCoy* (1993), 91 Ohio App.3d 570, 578, 632 N.E.2d 1358.

{¶ 75} Three appraisals of the marital residence were admitted into evidence. Appellee introduced the appraisal of Newell, a self-employed licensed auctioneer. Newell conducted an on-site inspection of the premises. He noted that the home was unfinished and that it had some defects, such as excessive water in the basement. Newell testified that he also took into account sales of comparable properties but did not specifically list any of those sales. Newell valued the property at $95,000.

{¶ 76} Two other written appraisals were admitted into evidence. One was done by Larry Garner, and appears to have been done at appellant's request expressly for the purpose of this litigation. The other was done by Robert H. Spring for Sky Bank as part of the parties' home equity loan refinancing in 1999. Neither Garner or Spring testified as to the accuracy of these appraisals, and it is not clear from the documents themselves whether either appraiser visited the residence prior to its appraisal.

{¶ 77} The trial court had all three appraisals to work with in determining the value of the marital residence. The court did not give much weight to the appraisal submitted by Garner because it appeared that he did not actually visit the site. The court also discounted the reliability of the Sky Bank appraisal because it was completed in support of a home equity loan, rather than for the purpose of determining the value of the marital residence as part of divorce proceedings. Based on the evidence before the trial court, and especially given the fact that Newell actually visited the site of the marital residence prior to

making his appraisal, the trial court did not abuse its discretion in choosing Newell's appraisal over the other two. Appellant's third assignment of error is hereby overruled.

{¶ 78} Appellant's fourth and final assignment of error asserts:

{¶ 79} "The trial court erred in requiring appellant to pay appellee child support as appellee presented insufficient evidence to verify his income."

{¶ 80} Appellant presents two arguments with respect to this assignment of error. First, she asserts that there is no child support computation worksheet in the record as required by former R.C. 3113.215 and by *Marker v. Grimm* (1992), 65 Ohio St.3d 139, 142, 601 N.E.2d 496. Second, appellant contends that the testimonial evidence used to establish and verify appellee's income was not sufficient to support the income amount used in calculating the child support award. Appellant contends that former R.C. 3113.215(B)(5)(a) requires that *documents* be used to verify income: "The parents *shall verify* current and past income and personal earnings *with suitable documents,* including but not limited to, pay stubs, employer statements, receipts and expense vouchers related to self-generated income, tax returns, and all supporting documentation and schedules for the tax returns." (Emphasis added.)

{¶ 81} Appellee argues in rebuttal that proper child support computation worksheets were filed with the court. Appellee argues that *Marker* does not require any particular method of including the child support computation worksheet into the record, but only requires that the worksheet be included in the record. *Marker,* supra, at paragraph one of syllabus. Appellee points out that appellant filed her worksheet on August 11, 2000, and that appellee filed his on August 17, 2000. Appellee concludes that worksheets were in the record and the trial court, in its discretion, adopted the worksheet submitted by appellee.

{¶ 82} Appellee also asserts that appellant raided appellee's home and took the very papers and supporting documents that could have been used to verify his income. Appellee argues that appellant cannot now dispute the testimony used to calculate appellee's income because she was responsible for the fact that there was no better evidence available.

{¶ 83} Appellee's arguments are persuasive.

{¶ 84} "It is well established that a trial court's decision regarding child support obligations falls within the discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion." *Pauly v. Pauly* (1997), 80 Ohio St.3d 386, 390, 686 N.E.2d 1108, citing *Booth,* supra, 44 Ohio St.3d at 144, 541 N.E.2d 1028.

{¶ 85} Appellant's argument that there is no child support calculation worksheet in the record is incomprehensible because both parties filed worksheets and those worksheets are part of the record. Appellee filed his worksheet on July 31, 2000, and filed an amended worksheet on August 17, 2000. Appellant filed her worksheet on August 11, 2000. The trial court adopted appellee's worksheet as its own, and used the calculations from the August 17, 2000, worksheet in making its child support determination.

{¶ 86} *Marker* mandates that "[a] child support computation worksheet, required to be used by a trial court in calculating the amount of an obligor's child support obligation in accordance with [former] R.C. 3113.215, must actually be completed and made a part of the trial court's record." *Marker* at paragraph one of syllabus. The trial court complied with *Marker* in every detail.

{¶ 87} Appellant is technically correct as to the wording of former R.C. 3113.215(B)(5)(a), because it does state that the parents "*shall* verify * * * income * * * with suitable *documents* * * *." (Emphasis added.) Nevertheless, it is difficult to understand how appellant can now object to the worksheet computation of appellee's gross income, and to the evidence used to support that computation, when (1) the same figure for appellee's net income is used on both appellant's and appellee's child support computation worksheets, namely, $11,206; (2) appellant did not object at any time prior to this appeal that the figure of $11,206 was inaccurate or unsupported; and (3) there is evidence in the record that appellant removed the very documents which could have further supported appellee's income calculations.

{¶ 88} Under the invited-error doctrine, a party is not permitted to take advantage of an error that she herself invited or induced the court to make. *State ex rel. Soukup v. Celebrezze* (1998), 83 Ohio St.3d 549, 550, 700 N.E.2d 1278; *Lester v. Leuck* (1943), 142 Ohio St. 91, 26 O.O. 280, 50 N.E.2d 145, paragraph one of the syllabus. By removing the documents, appellant can certainly be said to have induced the error.

{¶ 89} It is axiomatic that when a party fails to bring to the trial court's attention an error at a time when the error could be corrected, such error is waived on appeal. *State v. Carter* (2000), 89 Ohio St.3d 593, 598, 734 N.E.2d 345.

{¶ 90} It should also be noted that appellee did produce some documentation as to his income. He produced his 1999 tax filings, along with some of the supporting documents. Therefore, to a limited extent, appellee did literally comply with former R.C. 3113.215(B)(5)(a).

{¶ 91} The Rules of Evidence support appellee's use of testimony to prove the contents of the missing financial documents. Evid.R. 1002, known as the "best evidence rule," requires that "[t]o prove the content of a writing * * *

the original writing * * * is required, except as otherwise provided in these rules * * *." Because former R.C. 3113.215(B)(5)(a) *requires* the use of documentary evidence, the "best evidence rule" is necessarily triggered.

{¶ 92} It is axiomatic that the admission or exclusion of evidence is generally within the sound discretion of the trial court and a reviewing court may reverse only upon the showing of an abuse of that discretion. *Renfro v. Black* (1990), 52 Ohio St.3d 27, 32, 556 N.E.2d 150.

{¶ 93} Evid.R. 1004 provides a number of exceptions to the "best evidence rule":

{¶ 94} "The original is not required, and *other evidence of the contents of a writing,* recording, or photograph *is admissible if:*

{¶ 95} "(1) Originals lost or destroyed

{¶ 96} *"All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith;* or

{¶ 97} "(2) Original not obtainable

{¶ 98} "No original can be obtained by any available judicial process or procedure; or

{¶ 99} "(3) Original in possession of opponent

{¶ 100} *"At a time when an original was under the control of the party against whom offered, he was put on notice, by the pleadings or otherwise, that the contents would be subject of proof at the hearing, and he does not produce the original at the hearing;* or

{¶ 101} "(4) Collateral matters

{¶ 102} "The writing, recording, or photograph is not closely related to a controlling issue." (Emphasis added.)

{¶ 103} The record supports that both Evid.R. 1004(1) and 1004(3) apply to this case. Appellee testified that the required documents were stolen from his home, but that some of those documents were later returned to him by appellant's attorney. The clear implication is that appellant took the documents. Appellant, on the other hand, denied that she took any documents. It was up to the trial court to determine, in light of Evid.R. 1004, whether appellee's testimony was in bad faith or if appellant actually had the documents and refused to make them available for trial. Although the trial court does not specifically state that it believed appellee's testimony rather than appellant's, the trial court's decision reflects that it believed appellee's version of what happened to the documents,

and thereby accepted appellee's oral and limited documentary evidence of his income. As is often stated, it is primarily up to the trier of fact to determine the weight and credibility of evidence. *Bechtol*, supra, 49 Ohio St.3d at 23, 550 N.E.2d 178. The trial court's decision is supported by the record and is not unreasonable, arbitrary or capricious. Therefore, there was no abuse of discretion in the admission of evidence.

{¶ 104} For the foregoing reasons, appellant's fourth assignment of error is overruled.

{¶ 105} In conclusion, we find that appellant's first assignment of error has merit, in that the record does not support the very broad exclusion of all unrelated males from appellant's visitation. The visitation order contained on page 6 of the February 20, 2001, decree is hereby reversed and the case is remanded for the limited purpose of redetermining appellant's visitation rights. Appellant's second assignment of error has been overruled because the trial court properly applied the "direct adverse impact" test outlined in *Whaley* and *Rowe* in making its determination. Appellant's third assignment of error has been overruled because the trial court was within its discretion to use an appraisal of the marital residence that was considerably lower than two other appraisals. Appellant's fourth assignment of error has been overruled because appellant has both waived the error and induced it, and because Evid.R. 1004 allows alternative evidence to be admitted to prove the contents of a writing if the writing is lost, destroyed, or in the possession of the opposing party. The February 20, 2001, decree is partially reversed and remanded with respect to the visitation order and affirmed in all other aspects.

Judgment accordingly.

GENE DONOFRIO and DEGENARO, J., concur.