[Cite as *In re I.E.*, 2020-Ohio-3477.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| IN RE: I.E. | : | Appellate Case No. 28646 |
| | : | Trial Court Case No. 2014-5431 |
| | : | (Appeal from Common Pleas Court – Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of June, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Appellee - Montgomery County Children Services

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
     Attorney for Appellant - Mother

. . . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which denied her motion for change of custody. Mother had sought to regain custody of her son, I.E., from Maternal Grandparents, who had legal custody of him.   Mother claims that the trial court erred in concluding that no change of circumstances had occurred and that retaining legal custody with Maternal Grandparents was in I.E.'s best interest.   Mother also challenges the trial court's order prohibiting Mother from residing with I.E.   For the following reasons, the trial court's judgment will be affirmed.

## I. Procedural History

**{¶ 2}** In June 2014, the Montgomery County Department of Job and Family Services – Children Services Division (MCCS) became involved with Mother based on a referral from the children services agency in Lexington County, South Carolina, after Mother took I.E. (born April 2008) and relocated to Dayton.   The South Carolina agency had placed I.E. on a safety plan with Maternal Grandparents due to Mother's "instability, mental health issues and her failure to provide for her child's basic needs."   On August 13, 2014, MCCS filed a dependency complaint regarding I.E., and the trial court subsequently adjudicated I.E. a dependent child.   The court granted temporary custody of I.E. to MCCS, and I.E. was placed in foster care.

**{¶ 3}** Throughout the case, I.E. expressed that he did not want to visit with Mother and that he was afraid of her.   According to the reports of the guardian ad litem (GAL), Mother repeatedly made accusations that I.E. was being brainwashed by his foster parents and others involved with the case, and Mother scolded and threatened I.E. during

their interactions. School personnel indicated that I.E. displayed emotional problems, which increased during the week in anticipation of visitation with Mother; these problems significantly affected I.E.'s educational progress. In several reports, the GAL expressed concern that I.E. was being "traumatized" by visitation with Mother. Mother's visitation with I.E. was modified due to Mother's disruptive behavior.

{¶ 4} In June 2016, one of Mother's brothers was granted interim custody of I.E. By the end of October, however, Uncle indicated that he was no longer able to care for the child. Ultimately, on December 7, 2016, MCCS moved for permanent custody, and it later amended its motion to include an alternative disposition of legal custody to Maternal Grandparents, who resided in South Carolina, with protective supervision to MCCS.

{¶ 5} On June 1, 2017, upon agreement of all parties, the trial court granted legal custody of I.E. to Maternal Grandparents with protective supervision to MCCS until June 3, 2018. With respect to Mother's parenting time, the judgment stated:

Mother's parenting time shall be as determined by the child's therapist. In the event, [sic] that visitation recommences for mother, the visits shall first begin in a therapeutic setting. Any visits between mother and child shall take into consideration the child's welfare and best interest. Any visits between mother and child shall be supervised.

{¶ 6} On November 14, 2017, Mother moved for a change of custody, asking that she be given legal custody of I.E. Alternatively, Mother sought a modification of parenting time. On June 14, 2018, a magistrate conducted a hearing on Mother's motion, during which Mother and MCCS caseworker Carol Rothfuss testified. At the

conclusion of the hearing, the magistrate orally denied Mother's motion for change of custody, modified Mother's visitation to allow visitation supervised by Maternal Grandparents, and ordered that Mother not reside with I.E. The magistrate concluded, in part, that Mother had not demonstrated "any change of circumstances pursuant to [R.C.] 2151.42(B) regarding the child or custodians during this past year," that I.E. had been "thriving," and that "any placement of the child with the mother would not be in his best interest." The same day, the magistrate filed a written entry consistent with her oral pronouncements.

{¶ 7} Mother filed objections to the magistrate's ruling.[1] The trial court overruled Mother's objections and denied Mother's motion for change of custody. The trial court also ordered modification of Mother's visitation consistent with the magistrate's ruling and prohibited Mother from residing with I.E.

{¶ 8} Mother appeals from the trial court's judgment, raising three assignments of error. We will address them in an order that facilitates our analysis.

## II. Change of Custody for Dependent Child After Disposition

{¶ 9} If a child is adjudicated an abused, neglected, or dependent child, the court may, among other possible dispositions, "[a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings." R.C. 2151.353(A)(3). "In choosing among the alternatives, the best

---

[1] Mother filed supplemental objections on February 11, 2019. That document is not listed on the summary of docket and journal entries, but it is included in the record.

interest of the child is the court's primary consideration." (Citations omitted.) *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 13.

{¶ 10} R.C. 2151.353(F)(1) and (2) and R.C. 2151.42(A) and (B) govern the modification or termination of dispositional orders involving abused, neglected, or dependent children. *E.g.*, *In re A.S.*, 2d Dist. Montgomery No. 27156, 2016-Ohio-7622, ¶ 10; *In re L.M.*, 2d Dist. Greene No. 2010-CA-76, 2011-Ohio-3285, ¶ 13. R.C. 2151.353(F)(1) grants the juvenile court continuing jurisdiction over any child for whom the court had entered an order of disposition, and R.C. 2151.353(F)(2) allows any party (other than a parent whose parental rights have been terminated) to "request the court to modify or terminate any order of disposition."

{¶ 11} If such a motion is filed, the court must hold a hearing on the motion as if the hearing were the original dispositional hearing. R.C. 2151.353(F)(2). At the hearing, in determining whether to return the child to the child's parent, the court must consider the best interest of the child. R.C. 2151.42(A).

{¶ 12} R.C. 2151.42(B) expressly states that a disposition of legal custody to a person "is intended to be permanent in nature." Accordingly, that statue further provides:

A court shall not modify or terminate an order granting legal custody of a child unless it finds, based on facts that have arisen since the order was issued or that were unknown to the court at that time, that a change has occurred in the circumstances of the child or the person who was granted legal custody, and that modification or termination of the order is necessary to serve the best interest of the child.

R.C. 2151.42(B).

### III. Change of Circumstances

{¶ 13} In her second assignment of error, Mother claims that the "juvenile court erred when it determined that Mother failed to show a change in circumstances." Mother asserts that there was no evidence that I.E. continued to be afraid of her.

{¶ 14} R.C. 2151.42 does not define the phrase "change in circumstances." R.C. 3109.04(E), which addresses the modification of a prior decree allocating parental rights, similarly requires a change of circumstances and also does not define that phrase. *See In re A.S.*, 2d Dist. Montgomery No. 27156, 2016-Ohio-7622, at ¶ 11 ("R.C. 3109.04(E)(1)(a) and R.C. 2151.42(B) both require the same 'change in circumstances' before an existing custody decree may be modified."); *In re K.W.*, 5th Dist. Guernsey No. 18 CA 34, 2019-Ohio-2121, ¶ 19 (change of circumstances factors in R.C. 3109.049(E)(1) may be instructive in R.C. 2151.42(B) cases).

{¶ 15} We have noted with respect to R.C. 3109.04(E) that "Ohio courts have held the phrase pertains to 'an event, occurrence, or situation which has a material and adverse effect upon the child.' " *In re A.P.*, 2d Dist. Montgomery No. 28023, 2019-Ohio-139, ¶ 23, quoting *Pierson v. Gorrell*, 12th Dist. Butler No. CA 2011-11-216, 2012-Ohio-3878, ¶ 13. "A change in circumstances must be one of substance, not slight or inconsequential, to justify modifying a prior custody order." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997); *Wiram v. Wiram*, 2d Dist. Clark No. 2017-CA-32, 2017-Ohio-7436, ¶ 5.

{¶ 16} By its terms, R.C. 2151.42(B) requires a change in the circumstances of the "child" or "the person who was granted legal custody." Consequently, a change of circumstances as to the child's parents, by itself, does not trigger a best-interest inquiry

under R.C. 2151.42(B). *See In re B.J.*, 1st Dist. Hamilton No. C-081261, 2009-Ohio-6485, ¶ 18.

{¶ 17} "In determining whether a change in circumstances has occurred so as to warrant a change in custody, a trial judge, as the trier of fact, must be given wide latitude to consider all issues which support such a change." *Davis* at paragraph two of the syllabus; *In re A.S.* at ¶ 12. Accordingly, "[w]e review the trial court's determination regarding a change of circumstances for an abuse of discretion." *In re L.M.*, 2d Dist. Greene No. 2010-CA-76, 2011-Ohio-3285, at ¶ 15, citing *In re A.N.*, 2d Dist. Greene Nos. 2010 CA 83, 2011 CA 7, 2011-Ohio-2422, ¶ 21. A trial court abuses its discretion when its decision is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 18} At the June 14, 2018 hearing, much of Mother's testimony concerned the efforts she had made since legal custody was granted to Maternal Grandparents. She testified that she had developed coping skills through a program at the Ellis Human Development Institute through Wright State University and had completed a parenting class. Mother indicated that she saw a therapist occasionally on her own, but that "[her] therapy has been going to the YMCA" and working out at the gym or swimming. Mother identified her "graduation" from the Ellis program and Eastway (from which she had received mental health services) as her change of circumstances, and she stated that she believed that she had completed her case plan.

{¶ 19} Mother did not have appropriate housing for her and I.E., and she stated that she intended to live with her parents in South Carolina if she obtained legal custody of I.E. Mother stated that she worked on a contract basis, which was "inconsistent," and

that she had been continuing her studies online with South University. Mother did not intend to get a job immediately upon returning to South Carolina, but did not perceive that she would have a problem obtaining one.

{¶ 20} With respect to her desire to have legal custody of I.E., Mother stated that she believed she was "in a good place mentally and emotionally to have legal custody" of her son. She thought that she was also "mentally and physically in a good place a couple years ago," but "this whole situation * * * has caused a lot of problems, but to be honest with you, I don't even think they were behavioral problems, I was just a distressed mother * * *." Mother expressed that she wanted to be more involved in her son's life and activities. She thought her son was being taught inappropriate life-skills, saying:

> "[H]e's being taught how to bow down to people who don't give a damn about him just because you don't have money. He's being taught not to be creative. He's being taught not to have a mind of his own. * * * He's being taught don't love anyone who's close to him, because if do you [sic] love him, then you going to be taken away from him. * * * That's what he's being taught."

Mother testified that she spoke with I.E. almost daily, and that the conversations were "playful" and that I.E. was "way too excited." Mother stated that the phone calls were "pretty good," but missing the "mother-son connection." Mother stated that she had not had visitation with I.E. since Uncle obtained temporary custody and had not otherwise seen I.E. Rothfuss testified, however, that she was aware that Mother's saw I.E. on a recent trip she took to South Carolina.

{¶ 21} Mother did not identify a change in I.E.'s or Maternal Grandparents'

circumstances.

{¶ 22} Rothfuss testified that she had not spoken with I.E. recently, but that she communicated with Maternal Grandparents and the local children services agency in South Carolina, which checks on I.E. on a monthly basis. Rothfuss stated that Maternal Grandparents were meeting I.E.'s basic needs and were taking him to counseling and other appointments. Maternal Grandmother had reported that I.E. sometimes did not want to answer the phone when he saw that his mother was calling. Rothfuss had not heard that I.E. was having nearly daily phone calls with Mother.

{¶ 23} Rothfuss was not aware of any change of circumstances regarding I.E., and she stated that, if anything, his situation was improving since Maternal Grandparents obtained legal custody. The local children services agency reported that I.E. likes being with his grandparents, and he likes to do what he does there. I.E. was becoming more comfortable and was adjusting better as time went on. I.E. was attending school and had advanced to the next grade. Maternal Grandparents opposed a change in custody. Mother acknowledged that her parents were "loving and appropriate people."

{¶ 24} Based on the evidence at the hearing, the trial court reasonably concluded that neither I.E. nor Maternal Grandparents had experienced a change of circumstances warranting a change in custody. Even accepting that Mother had made strides to improve herself since legal custody was granted to Maternal Grandparents, a change in Mother's circumstances, alone, is not relevant to R.C. 2151.42(B). And, at this juncture, the fact that a parent who was implicitly found unsuitable by an abuse/dependency adjudication may now be a suitable parent does not necessarily entitle the parent to regain legal custody of the child. *See In re L.M.*, 2d Dist. Greene No. 2010-CA-76, 2011-Ohio-

3285, at ¶ 20.

**{¶ 25}** Mother's second assignment of error is overruled.

### IV. Best Interest of the Child

**{¶ 26}** In her first assignment of error, Mother claims that the trial court erred in determining that granting custody of I.E. to Mother was not in I.E.'s best interest. The trial court noted that it was not required to address the best interest of I.E. in the absence of a change of circumstances, but it elected to consider I.E.'s best interest "for the sake of completeness." We will do likewise.

**{¶ 27}** R.C. 2151.42(A) does not identify particular factors that a court should consider in determining whether to terminate or modify a dispositional order. However, courts have been guided by the best-interest factors in R.C. 2151.414(D)(1), which are applicable to a motion for permanent custody. *See, e.g., In re C.D.Y.,* 8th Dist. Cuyahoga No. 108355, 2019-Ohio-4987, ¶ 11. The factors in R.C. 2151.414(D)(1) include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child * * *;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 28}** Courts have also looked to the best-interest factors in R.C. 3109.04(F)(1),

which is applicable to the allocation of parental rights in domestic relations matters. *In re C.D.Y.* at ¶ 12. Those factors include:

(a) The wishes of the child's parents regarding the child's care;

(b) * * * [T]he wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * *

* * *

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 29} Upon review of the record, we find no abuse of discretion in the trial court's determination that retaining legal custody with Maternal Grandparents was in I.E.'s best

interest.

{¶ 30} I.E. was initially removed from Mother's custody in 2014, and he had multiple placements until his Maternal Grandparents were granted legal custody in June 2017. I.E.'s interactions with Mother during the pendency of the case caused I.E. severe anxiety and fear. Mother indicated that she has had no visitation with I.E. since Uncle obtained legal custody of I.E. Rothfuss testified that Mother reportedly had seen I.E. in South Carolina shortly before the hearing on her motion, but Mother denied it. Rothfuss indicated that Mother's visitation with I.E. should be supervised and that Maternal Grandparents were capable of supervising that visitation. Rothfuss was not comfortable with Mother's having unsupervised contact with I.E.

{¶ 31} Mother testified that she had "pretty good" conversations with I.E. almost daily, during which I.E. was "excited" and "playful," but to Rothfuss's knowledge, I.E. did not speak about Mother and sometimes avoided her phone calls. Mother's interactions with other people have been described as "extremely hostile" and at times "very inappropriate."

{¶ 32} I.E. reported that he liked being with his grandparents and felt safe. Rothfuss testified that I.E. was adjusting better and becoming more comfortable, and he had advanced a grade in school. Mother testified that she believed that I.E. was being taught to "bow down to people who don't give a damn about him" and the like, but the trial court noted that Mother provided no evidence to corroborate her claim. When asked if the local children services agency talked with I.E. about his mother's motion and how he would feel about being placed with her, Rothfuss responded: "I had asked the therapist to talk with him. [I.E.] is still pretty superficial in his interactions, but he doesn't talk about

his mother."

{¶ 33} Mother testified that she was mentally, emotionally, and physically capable of having custody of I.E. Mother believed that she had completed her case plan and had done everything necessary to have I.E. returned to her. Mother emphasized that she had completed parenting and coping skills classes and received therapy. Mother indicated that she was no longer taking medication, and that her therapy consisted of exercising at the YMCA. Mother stated that she has a large support system in South Carolina consisting of her parents and other family members, and that she would provide all the basic necessities for her son. Mother wanted to be involved in I.E.'s counseling, education, and other activities. Mother was continuing her education online with South University.

{¶ 34} However, the evidence indicated that Mother did not have appropriate housing for I.E. or stable income. Although Mother testified that she had been residing in the same residence for two years, she testified that she did not have housing for her and I.E. Mother stated that she planned to reside with her parents in South Carolina if she obtained legal custody. There was no testimony about whether Mother's parents would allow her to live at their home. Mother also stated that she worked on contract, which she indicated was inconsistent; she did not plan on getting a job immediately after receiving custody of I.E., but she thought that she would have no difficulty finding employment. Mother received Supplemental Security Income (SSI).

{¶ 35} Concerns about Mother's mental health continued throughout the case. Mother stated that she "graduated" from Eastway, where she received mental health treatment. However, she testified that Eastway only wanted to give her medicine for

depression, which she decided not to take. Mother stated that she occasionally saw a therapist, but that her therapy primarily consisted of exercising at the YMCA.

{¶ 36} At the hearing on Mother's motion, Mother wanted to withhold information about a second address she used, citing privacy concerns. She eventually admitted that she resided in Dayton, but used her parents' address in South Carolina to obtain a driver's license.

{¶ 37} Both MCCS and the guardian ad litem believed that it was in I.E.'s best interest for him to remain with Maternal Grandparents. Mother acknowledged that her parents were loving people.

{¶ 38} With the evidence before it, the trial court did not abuse its discretion in determining that Mother had failed to show that granting legal custody of I.E. to her was in I.E.'s best interest. Mother did not have housing for I.E., Mother had no plan for employment, Mother was not engaged in ongoing mental health treatment (other than occasional therapy and exercise), Mother had not visited with I.E. in more than a year, unsupervised contact between Mother and I.E. was not advised, and I.E. was happy and thriving with Maternal Grandparents as his legal custodians.

{¶ 39} Mother's first assignment of error is overruled.

### V. Restriction on Mother's Residing with Child

{¶ 40} Mother's third assignment of error states: "The juvenile court erred by ruling that Mother may not reside in the same home as the child."

{¶ 41} Mother provides several reasons why the trial court's ruling should be reversed. First, she claims that the trial court's conclusion is not supported by the record, as demonstrated by the trial court's failure to justify its order. Second, she argues that

the trial court's ruling precludes her from living with her parents, who are part of her support system. Third, she states that I.E.'s therapist indicated the she could have supervised visitation, and the court recognized that Maternal Grandparents were capable of providing that supervision.

{¶ 42} In her objections to the magistrate's decision, Mother claimed that "[t]here was no evidence presented at the hearing which warranted the Magistrate's conclusion that Mother should be barred from residing with the child." The trial court rejected Mother's argument, stating that R.C. 2151.359(A)(1) granted the court authority to preclude Mother from residing with I.E. The trial court did not specifically address whether the order was supported by the record, although it concluded, as did the magistrate, that Mother's residing with I.E. would be detrimental to the child.

{¶ 43} R.C. 2151.359(A)(1) reads:

(A)(1) In any proceeding in which a child has been adjudicated an unruly, abused, neglected, or dependent child, on the application of a party, or on the court's own motion, the court may make an order restraining or otherwise controlling the conduct of any parent * * * if the court finds that an order of that type is necessary to do either of the following:

(a) Control any conduct or relationship that will be detrimental or harmful to the child.

(b) Control any conduct or relationship that will tend to defeat the execution of the order of disposition made or to be made.

{¶ 44} As stated above, Mother testified that she spoke with I.E. on the phone almost every day, but Rothfuss was not aware of frequent phone conversations, and

Maternal Grandmother had indicated that I.E. sometimes did not want to answer the phone if he knew Mother was calling. Again, Mother indicated that she had not visited with I.E. in person for over a year, and the recommendation was for Mother to have supervised visitation. Rothfuss testified that Mother had completed a parenting and psychological assessment with Dr. Lilley, who observed Mother and I.E. together and recommended against reunification.

{¶ 45} Mother indicated that she did not plan to get a job right away after moving to South Carolina, so that she could spend more time with I.E. Mother indicated that she planned to get involved in her son's school and his counseling and to participate in activities with him.

{¶ 46} Rothfuss testified that I.E. had previously reported that he did not feel safe with Mother, and Rothfuss stated that she would be uncomfortable with Mother's having unsupervised contact with I.E. When asked why, Rothfuss responded:

Because Mother's behavior in the past has been bizarre. Her interactions with other people tends to be extremely hostile and at times very inappropriate. [I.E.'s] shown fear of that. He really deteriorated when he was having visits with his mother, but at his last foster placement, without those visits, we really started to see [I.E.] become stable and be able to function and go to school without the anxieties and the fears that he had before.

The guardian ad litem opined that it would not be appropriate for Mother to reside with her parents and I.E. if she returned to South Carolina.

{¶ 47} Based on the evidence, the trial court could have reasonably concluded that

limited supervised contact between I.E. and Mother was appropriate, but that it was inappropriate for Mother to reside with I.E. I.E. had expressed fear of Mother in the past, and their past visitation had resulted in severe anxiety and mental trauma for I.E. When legal custody was granted to Maternal Grandparents, Mother was to have visitation with I.E. in a therapeutic setting as determined by I.E.'s therapist; Mother had no visitation since Maternal Grandparents received legal custody. Mother testified that she had nearly daily positive telephone conversations with I.E., but that testimony was not corroborated. To the contrary, Maternal Grandmother had reported that I.E. sometimes avoided answering the phone when Mother called.

{¶ 48} Mother's living with I.E. likely would have resulted in extensive contact between I.E. and Mother. While Maternal Grandparents could supervise Mother's contact with I.E., the amount of supervision that would be required if Mother lived in the same household would be substantially greater than if Mother lived elsewhere. Moreover, if Mother resided with I.E., there would be a risk that some of Mother's time with I.E. would be unsupervised, to I.E.'s detriment. In short, the trial court reasonably concluded that restricting Mother from residing with I.E. was necessary to control conduct by Mother that would be detrimental or harmful to I.E. The fact that Mother is precluded by the order from living with part of her support system does not alter this conclusion.

{¶ 49} Mother's third assignment of error is overruled.

## VI. Conclusion

{¶ 50} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck Jr.
Lisa M. Light
Robert Alan Brenner
Helen Hoke, GAL
Charles Claypool
Father
Hon. Anthony Capizzi