[Cite as *In re H.U.J.*, 2023-Ohio-3084.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN RE H.U.J. & H.A.E. | : |
| | : |
| | :     C.A. No. 29745 |
| | : |
| | :     Trial Court Case Nos. G-2020-001230-0M,0P; G-2020-001231-0O,0R |
| | : |
| | :     (Appeal from Common Pleas Court-Juvenile Division) |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on September 1, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

MISTY CONNORS, Attorney for Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, denying her motion to amend visitation with her two minor children. For the following reasons, we will affirm the judgment of the trial court.

      **I.**    **Statement of the Case and Facts**

{¶ 2} Mother is the biological mother of H.U.J. (born in 2017) and H.A.E. (born in

2018).[1]   The biological father of H.U.J. is deceased and had been during the entirety of these proceedings.   The legal father of H.A.E., who was never married to Mother, has not filed a responsive brief or otherwise participated in this appeal.   These cases originated on March 13, 2020, after Mother was taken into custody for child endangering, and police gave emergency custody of the children to Montgomery County Children Services ("MCCS" or "the agency").   On March 16, 2020, MCCS filed a complaint for each child alleging dependency and abuse.   After the shelter care hearing held that same day, interim temporary custody of the children was granted to Paternal Aunt.   However, Paternal Aunt was due to give birth imminently, causing her to be unable to care for the children, and interim temporary custody was transferred to MCCS on March 21, 2020. Mother was granted supervised visitation with both children, which was to take place at the agency.

{¶ 3} An adjudicatory hearing occurred on September 30, 2020, at which time both children were found dependent and temporary custody of the children was granted to MCCS.   Mother was granted visitation time as designated by the agency in accordance with Mother's progress on the case plan.

{¶ 4} Between September 30, 2020, and February 18, 2022, various motions were filed relating to custody or increasing or decreasing Mother's visitation time.   None of these motions are pertinent to this appeal.   On February 18, 2022, Mother filed a motion for legal custody of H.U.J. to be given to Paternal Aunt and for legal custody of H.A.E. to go to a non-relative who previously had fostered both H.U.J. and H.A.E. during the

---

[1]  In order to protect the privacy of the minors, we will use initials or descriptions for certain individuals in this opinion.

pendency of the case ("Foster Mom"). That same day, MCCS also filed a motion for legal custody of H.U.J. and H.A.E. to be given to Paternal Aunt and Foster Mom, respectively. On March 2, 2022, the court appointed special advocate guardian ad litem ("GAL") filed a motion for permanent custody of both children to be granted to MCCS.

{¶ 5} On May 25, 2022, a hearing was held on the motions for legal custody and the motion for permanent custody. At that time, all parties agreed for legal custody of H.U.J. to go to Paternal Aunt and for legal custody of H.A.E. to go to Foster Mom. Visitation time for Mother was to remain supervised at the agency for two hours on Tuesdays until such time as Mother and the legal custodians could arrange visitation through Erma's House or some other supervised visitation location. MCCS was granted three months of protective supervision to assist with the transition and to supervise Mother's visitation time while at the agency. A review hearing was scheduled for August 24, 2022.

{¶ 6} On July 29, 2022, the GAL filed a motion requesting that the protective supervision be extended and that any in-person visitation with Mother be suspended until the visits could occur at Erma's House. According to the GAL, both legal custodians were no longer willing to act as supervisors for the visitations, and the GAL was concerned about Mother's ability to monitor the children during community visits. In lieu of the in-person visits, the GAL requested that Mother have virtual visits with the children until Mother could be accepted into Erma's House.

{¶ 7} The supervised visits returned to the agency pursuant to the GAL's motion, and on August 17, 2022, Mother filed a motion requesting that her visitation time be

modified and returned to in-person visits in the community. According to Mother, there were no problems during the three in-person supervised visits in the community and, therefore, there was no need to continue supervised visits at the agency.

{¶ 8} Along with the previously scheduled review hearing, a hearing on the motions to modify Mother's visitation time and for an extension of protective supervision was held on August 24, 2022, before a magistrate. At that time, MCCS no longer sought to have additional supervision time, and the focus of the hearing was on the competing motions to modify Mother's visitation time. An updated report and recommendation from the GAL was submitted prior to the hearing, which recommended that Mother's visitation be scheduled through virtual visits until visitation could occur at Erma's House. Although present, the GAL did not testify.

{¶ 9} Shelica Arnold, the ongoing MCCS caseworker assigned to the children's cases, testified at the hearing. She stated that the children were doing well in their respective placements and that all their needs were being met. At the time of the hearing, H.U.J. was in kindergarten and H.A.E. was in preschool. Arnold had no concerns for either of the children regarding their placements. Because the agency felt that both children were safe and that the custodians could work together to make sure the children were going to continue to see each other as well as Mother, Arnold explained that the agency did not feel it was necessary to request additional protective supervision.

{¶ 10} Arnold further testified about Mother's visitations since the court had granted legal custody of the children to the custodians. Following the grant of legal custody, Mother's visitation with the children had been scheduled at the agency for one

month for the legal custodians to get to know one another, and then visitations were to occur out in public. However, the visits at the agency were extended an additional month before Mother was given weekly supervised visitations at Island Park. Shortly thereafter, the supervised visitations at the park reverted back to the agency, where they had transpired for the six weeks prior to the hearing. During those six weeks, Arnold supervised Mother's visits at MCCS and stated that, during visits, Mother acted appropriately, was able to manage the two children together while in Arnold's presence, was on time and brought activities and food for the children, and paid attention to them during the visits.

{¶ 11} Arnold explained that the supervised visitation that was supposed to occur at Erma's House had been held up because the legal custodians had not turned in their packets. Arnold testified that as soon as the legal custodians turned in the packets, the supervised visits could begin at Erma's House.

{¶ 12} Mother testified that she had filed her motion to modify visitation because she wished to have visitations occur out in the community rather than at the agency or Erma's House. Mother stated that, when the visits occurred at Island Park, the children played on the playground and splash pad, fed the birds, and had snacks. When visits occurred at MCCS, Mother brought snacks, the kids played on the playground, and sometimes they watched videos. However, Mother complained that during the supervised visits at MCCS, she did not like that they were in a tiny room and that someone had to follow them around. Thus, Mother wished for her visitations to be out in the community rather than at a supervised facility.

{¶ 13} Although Mother testified that she loved being with her children, she stated that dealing with the custodians could "be a hassle." Mother explained that sometimes having set schedules for visitations made it difficult to get together because things would come up that interfered with the visitation time. According to Mother, Paternal Aunt did not attend all the visits at the agency and had been late several times. Because of that, Mother's visitation with H.U.J. had not been consistent. Foster Mom, on the other hand, would always reschedule visitation if a visitation had to be canceled. However, Mother had an issue with Foster Mom in that there were times she had had interactions with Foster Mom outside of visitation time while H.A.E. was present, and Mother had not been given an opportunity to interact with H.A.E., which she believed should have been given.

{¶ 14} Mother stated that she was willing to have virtual visits with the children if permitted and that it would help to have virtual visits in addition to in-person visits during the week. Mother elaborated, however, that when she did have virtual visits, she understood that the custodians would be in the vicinity to supervise but did not wish to have the custodians regulating her conversations with the children. As an example, Mother testified about a makeup virtual visit for a prior cancelled in-person visitation with H.U.J. during which Paternal Aunt intervened when Mother was discussing H.U.J.'s family tree and cut her off. Mother complained that Paternal Aunt was confusing H.U.J. with changing H.U.J.'s familial relationships, such as Paternal Aunt being called "mom" and Mother being called "auntie." Mother explained that if the familial relationships could be cleared up with H.U.J., she would be fine with the supervised virtual visits.

{¶ 15} Mother informed the court that she had not been kept up to date on medical

appointments of the children. She indicated that she wished to be aware of everything about the children, including medical, educational, and extracurricular activities. Mother testified that she was in counseling twice a week, attended therapy every week, attended all her prenatal visits for her on-going pregnancy, and attended parenting classes twice a week. Mother denied ever smoking around the children during visitations; she admitted that she might smoke either before or after a visitation, but not in the presence of her children.

{¶ 16} Irrespective of the issues Mother had with the legal custodians, Mother stated she was willing to work with the custodians to schedule visits with the children, and she agreed to abide by the custodians' rules for contact. Mother testified that she was a good mom and asked that the parties be more flexible.

{¶ 17} Paternal Aunt testified that she originally took emergency temporary custody of both of the children, but due to going into active labor, interim temporary custody of the children was turned over to MCCS. Paternal Aunt later obtained legal custody of H.U.J.

{¶ 18} Paternal Aunt testified that during the in-person visits out in the community between H.U.J. and Mother, Paternal Aunt was in the area but was not personally supervising the visits. Paternal Aunt was concerned that the visitations in the community were not supervised enough, as H.U.J. was able to run around instead of being in a contained area. That was a concern to her because she had observed that Mother was not always able to keep watch over both children at the same time.

{¶ 19} Paternal Aunt admitted that she had to reschedule two of H.U.J.'s in-person

visits to virtual visits. Paternal Aunt testified that during virtual visits, Mother was inattentive to H.U.J. and would focus on other things besides the child. Paternal Aunt had to schedule the second virtual visit due to her being in and out of the hospital. When Paternal Aunt attempted to call Mother for the rescheduled virtual visit, Mother refused to answer. Rather than answering the virtual video call, Mother called on the phone questioning why she could not get her in-person visit. Nevertheless, Paternal Aunt thought virtual visits were better than in-person visits because H.U.J. was more focused and not running around.

{¶ 20} Paternal Aunt was willing to supervise virtual visits but was not willing to supervise in-person visits. She had no problem with Mother having supervised visits at Erma's House, and Paternal Aunt was willing to provide transportation to and from Erma's House for visitation. As for the paperwork for Erma's House, Paternal Aunt testified that she had filled out the application, but when she went to turn it in, they did not accept it, because Mother had not yet turned in her application. Because Mother had since turned in her application, Paternal Aunt indicated she would re-submit her portion as well.

{¶ 21} Foster Mom also testified at the hearing and discussed supervising Mother's in-person visits with both children in the community since obtaining legal custody of H.A.E. Foster Mom stated that Mother had difficulty managing both children during the visits. During community visits, H.U.J. would act out and run off, causing Mother to leave H.A.E. behind in order to chase after H.U.J. in the park. However, Foster Mom explained that regardless of whether visitations occurred in the community or in a confined space, H.U.J. would frequently run off, climb on or under tables, and someone always had to

chase after her. Foster Mom acknowledged that Mother had left H.A.E. behind at the park to chase H.U.J. due to her pregnancy, because she would get too worn out. But even without Mother's pregnancy interfering, Foster Mom testified that Mother had difficulty controlling both children because Mother was not authoritative. Mother was unable to provide structure for the children and, according to Foster Mom, Mother had stated she did not want to be the disciplinarian for the children. There had also been an incident at the end of a visit at the park in which Mother was smoking in the presence of Foster Mom, Foster Mom's children, and H.A.E. Foster Mom had no concerns with conducting virtual visits.

{¶ 22} Following the hearing, the magistrate orally denied the request for an extension of protective supervision and denied Mother's request to modify her visitation time. Mother's visitation was ordered to occur virtually, once a week, until in-person supervised visitation could occur at Erma's House. A written decision reflecting the magistrate's oral pronouncement was issued on September 6, 2022.

{¶ 23} Mother filed an objection and a subsequent supplemental objection. The GAL filed a response supporting the trial court's decision. After reviewing the record, the trial court affirmed the magistrate's decision denying Mother's request to modify visitation, finding that it was in the children's best interest for Mother's visitation to remain supervised and to take place at Erma's House. However, the trial court also permitted Mother to have virtual visits with the children as agreed upon by the parties. Mother timely appealed.

## II. Analysis

**{¶ 24}** Mother's sole assignment of error on appeal asserts that the trial court erred in denying her motion to amend her visitation time. Specifically, Mother contends that because her behavior during visits and around the children was appropriate, and she could manage the children during visits according to the caseworker, the trial court's decision requiring the visits to remain supervised at Erma's House was not in the children's best interest and was an abuse of discretion.

**{¶ 25}** Generally, "R.C. 2151.353(F)(1) and (2) and R.C. 2151.42(A) and (B) govern the modification or termination of dispositional orders involving abused, neglected, or dependent children." *In re I.E.*, 2d Dist. Montgomery No. 28646, 2020-Ohio-3477, ¶ 10. However, "[t]here is no provision within R.C. Chapter 2151 addressing motions for visitation filed by a parent who has lost legal custody of a child after a finding of dependency." *In re C.J.*, 4th Dist. Vinton No. 10CA681, 2011-Ohio-3366, ¶ 15. Accordingly, trial courts must determine based on the totality of the circumstances whether a modification in visitation is in a child's best interest, which is guided by the factors identified in R.C. 3109.051(D). *Id.*, citing *In re Knisley*, 4th Dist. Ross No. 97CA2316, 1998 WL 372703, *2 (May 26, 1998).

**{¶ 26}** Because the focus of any visitation order is the best interest of the child, the trial court has discretion to "restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child." *Anderson v. Anderson*, 147 Ohio App.3d 513, 2002-Ohio-1156, 771 N.E.2d 303, ¶ 18 (7th Dist.), quoting *Jannetti v. Nichol*, 7th Dist. Mahoning No. 97-CA-239, 2000 WL 652540, *3 (May 12, 2000). "[T]he

parent who seeks to modify a previous visitation arrangement is the one who bears the burden of proof as to whether the arrangement is not in the best interest of the children." *In re Jergens*, 2d Dist. Montgomery No. 16848, 1998 WL 336702, *1 (June 26, 1998), citing *Bodine v. Bodine*, 38 Ohio App.3d 173, 175, 528 N.E.2d 973 (10th Dist.1988).

**{¶ 27}** "A decision on the modification of visitation or parenting time is within the trial court's sound discretion and will not be reversed absent an abuse of that discretion." (Citations omitted.) *In re J.P.L.*, 12th Dist. Warren No. CA2011-11-112, 2012-Ohio-4226, ¶ 7. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." (Citation omitted.) *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 28}** Upon review, we find no abuse of discretion in the trial court's best-interest determination. The record reflects that the trial court considered all the evidence and reasonably found that supervised in-person visitation with Mother at Erma's House was in the best interest of the children. Likewise, granting Mother additional virtual visits, determined by the agreement of the parties, was not an abuse of discretion.

**{¶ 29}** Testimony from the August 25, 2022 hearing reflected that Mother was unable to manage both children, who were only three and five years old, while out in the community. Mother had difficulty being an authoritarian and being willing to discipline the children. Mother acknowledged that she had no problem with the visits being

supervised, but she wanted them to be in the community, not at a controlled facility. Accordingly, the trial court reasonably determined that supervised visits were in the best interest of the children.

{¶ 30} In deciding where the supervised visits should occur, the trial court considered that, because MCCS had not obtained an extension of protective supervision, visits could no longer take place at the agency. Further, Paternal Aunt indicated that she was not willing to supervise in-person visits but had no problem with transporting H.U.J. to supervised visits at Erma's House. Foster Mom had previously agreed to supervise in-person visits, but she had expressed concern to the GAL about continuing to supervise further visits. Neither Paternal Aunt nor Foster Mom had any concern supervising virtual visits. There was no willing supervisor for in-person visitations unless visits occurred at Erma's House.

{¶ 31} Although Mother contends that Arnold testified Mother was able to manage both the children without difficulty, those supervised visitations occurred while Mother was at MCCS, not out in the community. Consequently, it appears that Mother could act appropriately with a supervised in-person visitation at a controlled facility but was unable to manage the children while supervised out in the community.

{¶ 32} Based on the totality of the evidence, it was not unreasonable for the trial court to order supervised visits at Erma's House with additional supervised virtual visits to be arranged as agreed by the parties. Because we cannot conclude that the court abused its discretion, Mother's sole assignment of error is overruled.

### III. Conclusion

{¶ 33} Having overruled Mother's assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and HUFFMAN, J., concur.